# EXHIBIT B

## IN ARBITRATION PROCEEDINGS BEFORE
## FINRA DISPUTE RESOLUTION, INC.

```
--------------------------------------------------------------------X
```
**In the matter of the Arbitration between**  :

DR. EUBULUS J. KERR, III,                     :
                                              :
                  Claimant,   :    **AMENDED STATEMENT OF CLAIM**
                                              :
      -v-                            :    FINRA No. 13-00041
                                              :
JOHN THOMAS FINANCIAL, BRIAN ROBERT ROTH, :
PETER DANIEL VIGLIONE, ANASTASIOS P.          :
BELESIS, GEORGE BELESIS, JOSEPH CATELLANO,   :
MARC GREENBERG, MICHELE ANN MISITI,           :
and GARY ROBERT PURWIN,                       :
                                              :
              Respondents.   :
```
--------------------------------------------------------------------X
```

Claimant Dr. Eubulus J. Kerr, III ("Dr. Kerr" and/or "Claimant"), by and through his attorneys, Lax & Neville LLP, as and for his Amended Statement of Claim, hereby submits the following claims against Respondents, John Thomas Financial ("John Thomas"), Brian Robert Roth ("Roth"), Peter Daniel Viglione ("Viglione"), Anastasios P. Belesis ("A. Belesis"), George Belesis ("G. Belesis"), Joseph Catellano ("Catellano"), Marc Greenberg ("Greenberg"), Michele Ann Misiti ("Misiti") and Gary Robert Purwin ("Purwin") (collectively referred to as "Respondents") to arbitration pursuant to the Uniform Rules of Arbitration, as adopted and amended by the Financial Industry Regulatory Authority, Inc. ("FINRA"), and alleges as follows:

# PARTIES

## Claimant

1.     During the time Dr. Kerr's account was opened with Respondents, he was a resident of Shreveport, Louisiana.  Claimant requests that the hearing in this matter be held by FINRA in its offices in New Orleans, Louisiana.

## Respondents

2.     Respondent John Thomas, CRD No. 40982, is and was a registered broker/dealer and member firm in good standing of FINRA.  John Thomas's principal place of business is located at 14 Wall Street, 23rd Floor New York, New York 10005.  As such, John Thomas is required to arbitrate this dispute with Claimant under the FINRA Code of Arbitration ("FINRA Code").

3.     Respondent Roth, CRD No. 4607595, is and was an associated person during the time Dr. Kerr's account was opened at John Thomas.  Roth was one of the two brokers of record for Dr. Kerr's account.  As such, Roth is required to arbitrate this dispute with Claimant under the FINRA Code.

4.     Respondent Viglione, CRD No. 4697621, is and was an associated person during the time Dr. Kerr's account was opened at John Thomas.  Viglione was the other broker of record for Dr. Kerr's account.  As such, Viglione is required to arbitrate this dispute with Claimant under the FINRA Code.

5.     Respondent A. Belesis, CRD No. 2707354, is and was an associated person during the time Dr. Kerr's account was opened at John Thomas.  A. Belesis is the Chief Executive Officer of John Thomas, and as such was a control person.  As the Chief Executive Officer, A. Belesis directs the management or policies of John Thomas and is the managing

member and owner of ATB Holding Company LLC, which is the owner of John Thomas. As such, A. Belesis is required to arbitrate this dispute with Claimant under the FINRA Code.

6. Respondent G. Belesis, CRD No. 4860444, is and was an associated person during the time Dr. Kerr's account was opened at John Thomas. G. Belesis was the President of John Thomas, and as such was a control person. As the President, G. Belesis directs the management or policies of John Thomas. As such, G. Belesis is required to arbitrate this dispute with Claimant under the FINRA Code.

7. Respondent Castellano, CRD No. 1158479, is and was an associated person during the time Dr. Kerr's account was opened at John Thomas. Castellano was the Chief Compliance Officer of John Thomas, and as such was a control person. As the Chief Compliance Officer, Castellano directs the management and/or policies of John Thomas. As such, Castellano is required to arbitrate this dispute with Claimant under the FINRA Code.

8. Respondent, Greenberg, CRD No. 2276287, is and was an associated person during the time Dr. Kerr's account was opened at John Thomas. Greenberg was the Branch Office Manager ("BOM") at John Thomas, and as such was a control person. As the BOM, Greenberg was responsible for supervising Roth and Viglione and monitoring the activity in Dr. Kerr's account. Greenberg was also the Senior Registered Options Principal ("SROP") of John Thomas, and as such was a control person. As the SROP, Greenberg supervised the options exposure and option trading activity in Dr. Kerr's account. As such, Greenberg is required to arbitrate this dispute with Claimant under the FINRA Code.

9. Respondent, Misiti, CRD No. 1931272, is and was an associated person during the time Dr. Kerr's account was opened at John Thomas. Misiti was also a BOM at John Thomas, and as such was a control person. As a BOM, Misiti was responsible for supervising

3

Roth and Viglione and monitoring the activity in Dr. Kerr's account. As such, Misiti is required to arbitrate this dispute with Claimant under the FINRA Code.

10.     Respondent, Purwin, CRD No. 2545792, is and was an associated person during the time Dr. Kerr's account was opened at John Thomas. Purwin was the Chief Financial Officer of John Thomas, and as such was a control person. As such, Purwin is required to arbitrate this dispute with Claimant under the FINRA Code.

## FACTUAL BACKGROUND

11.     Dr. Kerr is forty-four (44) years old, has been married for eight (8) years, and has four (4) children ages seven (7), four (4), and three (3) year old twins. In 1990, Dr. Kerr graduated from Colorado State University with a Bachelor of Science in Biochemistry. Dr. Kerr graduated from the Wayne State University School of Medicine with a Doctorate of Medicine in 1996. During his studies at medical school, Dr. Kerr was awarded the Honor of a Clinical Clerkship in 1995, as well as Recognition of Excellence in Medical Pharmacology in 1994.

12.     After receiving his Doctorate of Medicine, Dr. Kerr interned at the Indiana University Medical Center from 1996 through 1997, and thereafter, conducted his Residency in Orthopedic Surgery at the Indiana University Medical Center from 1997 through 2001. Dr. Kerr has also completed various fellowships including, but not limited to, fellowships at the University of Chicago Spine Center at Weiss Memorial Hospital.

13.     Subsequently, Dr. Kerr acquired specialized skills after undergoing Medtronic Satellite Training, SpinalMotion Kineflex Artificial Disc Comprehensive Training, Charite Artificial Disc Comprehensive Training and Orthovita and Advances in Vertebroplasty Training.

4

14.     Dr. Kerr received his Certification from the American Board of Orthopedic Surgeons in September 2004, as well as his Certification from the American Board of Spine Surgery in September 2006.

15.     Currently, Dr. Kerr practices at the Spine Institute of Louisiana and is also an Assistant Professor at the Louisiana State University Health Sciences Center in the Department of Orthopedic Surgery. Dr. Kerr is affiliated with the Christus Shumpert Health System, the Willis Knighton Health System, the Surgical Specialty Center, the Doctors Hospital and the Bossier Specialty Hospital. He is also an active member of the North American Spine Society, the American Academy of Orthopedic Surgeons, the Louisiana State Medical Society and the Shreveport Medical Society.

16.     Dr. Kerr has contributed to the following publications: (1) Delayed Hyper-Reactivity To Metal Ions After Cervical Disc Arthroplasty: A Case Report And Literature Review (April 2009); (2) Choice Of Plate May Affect Outcomes For Single Multilevel ACDF: Results Of A Prospective Randomized Single-Blind Trial (February 2009); (3) Implant Design May Influence Delayed Heterotropic Ossification After Total Disc Arthroplasty In Lumbar Spine: A Case Report (2009); (4) Primary Oseoblastic Osteosarcoma In An Elderly Female:  A Case Report Of Perplexing Presentation (2006); (5) Intraspinal Meningioma In A 101-Year Old: Should Age Determine The Aggressiveness Of Intervention?; and (6) Chapter 48 in the AAOS Instructional Court Lecture Series – Minimally Invasive Treatments of Osteoporotic Vertebral Compression Fractures:  Vertebroplasty and Kyphoplasty.

17.     Moreover, Dr. Kerr has participated in the following research activities:   (1) Axiomed "Freedom Lumbar Artificial Disc," FDA, Investigational Device Evaluation (IDE) (2009 – present); (2) A Non-Randomized, Prospective, Muli-center Feasibility Study of the

Disc Dynamics DASCOR Disc Arthroplasty Device in the Treatment of Degenerative Disc Disease (2008 – present); (3) A Prospective, Multi-center, Randomized Study Comparing the VertiFlex Superion Interspinous Spacer (ISS) to the X-STOP Interspinous Process Decompression (IPD) System In Patients with Moderate Lumbar Spinal Stenosis (2008 – present); (4) Clinical Trial Comparing the Blackstone Advent Cervical Disc to Anterior Cervical Discectomy and Fusion (ACDF) for the Treatment of One Level Degenerative Disc Disease (Principal Investigator) (2008 – present); (5) A Multi-Center, Prospective, Randomized, Controlled Clinical Trial Comparing the Safety and Effectiveness of the Modi-C Prosthesis to Conventional Anterior Cervical Discectomy and Fusion in the Treatment of Symptomatic Degenerative Disc Disease (DDD) in the Cervical Spine (2007 – present); (6) A Randomized, Controlled Clinical Study to Evaluate the Safety and Effectiveness of Cortoss Synthetic Cortical Bone Void Filler in Vertebral Augmentation. FDA, Investigational Device Evaluation (IDE) study site. (2006 – present); (7) Kine*flex*/C Cervical Disc Arthroplasty, FDA, Investigational Device Evaluation (IDE) study site (2005 – present); (8) Kine*flex*/C Lumbar Disc Arthroplasty, FDA, Investigational Device Evaluation (IDE) study site (2005 to present); (9) Pars Fracture Fixation for Grade I Spondylolisthesis using ISOLA Instrumentation, a Unique Construct (2001); (10) Investigation of: "An In Vitro Model of Fibroblast Activity and Adhesion Formation During Flexor Tendon Healing." (1995 – 1996); and (11) Investigation of: "Glutamine Activity During Compensatory metabolic Acidosis in Pig Kidney Tubule Cells" – Colorado State University (1990).

18.     Dr. Kerr has also participated in the following international and national presentations: (1) Kyphoplasty Combined With Percutaneous Osteotomy For The Treatment Of Kyphosis Associated With Non-Acute Osteoporotic Vertebral Fractures (10th International

Meeting On Advanced Spine Techniques – Rome, Italy – May 2002); (2) Balloon Kyphoplasty For The Treatment Of Painful Spinal Seformity Resulting From Osteoporotic Vertebral Compression Fractures (North American Spine Society 17th Annual Meeting – Montreal, Canada – 2002); (3) Total Disc Arthroplasty Versus ACDF For Single Level Cervical Disc Disease: Results Of a Prospective Randomized Single-Blind Trial (Annual Meeting of North American Spine Society – Toronto, Canada – October, 2008); (4) Prospective Randomized Trial To Compare The Results Of Total Disc Arthroplasty With Anterior Cervical Discectomy And Fusion: Preliminary Results (Annual Meeting Of Congress Of Neurological Surgeons – Orlando, Florida – October 2008); (5) Assessment Of Fusion Rates In Adult Patients Undergoing Lumbar Interbody Fusion Procedures With Osteoinductive Stem-Cells Allograft Materials (Accepted For Presentation At The Annual Meeting Of Congress Of Neurological Surgeons – New Orleans, Louisiana – October 2009); (6) Device Displacement And Reoperation Following Cervical Total Disc Arthroplasty: Analysis Of Probable Causes In Three Consecutive Cases (Annual Meeting Of Louisiana Association Of Neurological Surgeons – January 2009); (7) Incidence, Timing And Probable Causes Of Device Displacement Following Cervical Total Disc Arthroplasty (Annual Meeting Of Louisiana Association Of Neurological Surgeons – January 2009); (8) Balloon Kyphoplasty For The Treatment Of Painful Spinal Deformity Resulting From Osteoporotic Vertebral Compression Fractures (AOA 116th Annual Meeting – Charleston, South Carolina – June 2003); (9) Preliminary Report "Direct Repair Of Spondylolysis In An Adult Population Using A Pedicle Screw, Rod And Slotted Connector Construct And Bone Graft Of The Pars Defect (Spine + Science + Management Program – New Orleans, Louisiana – 2000); (10) Cervical Spine Injuries In Football Players (Grand Rounds Presentations: University Of Chicago Medical Center – September 2000); (11)

7

Cervical Radiculopathy – Diagnosis and Non-Operative Management (Grand Rounds Presentations: University Of Chicago Medical Center – August 2000); and (12) Management Of Spinal Cord Injury (Grand Rounds Presentations: University Of Chicago Medical Center – July 2000).

**Dr. Kerr Opens An Account With Respondents In April 2011**

19.    Dr. Kerr opened an account with Respondents in April 2011 by depositing $733,000 into his new account.[1]    Upon opening his account with John Thomas, Roth and Viglione were designated as Dr. Kerr's brokers.

20.    After Dr. Kerr's initial $733,000 deposit, Dr. Kerr made two additional deposits into his account; the second deposit was made in June 2011 in the amount of $8,000[2] and the third deposit was made in July 2011 in the amount of $60,000.    In total, from April 2011 through the time he closed his account in March 2012, Dr. Kerr entrusted $801,000 to Respondents.

21.    Since Dr. Kerr is a prominent and extremely busy orthopedic spine surgeon, Respondents knew that Dr. Kerr was relying on them to advise him and to maintain his account in a reasonable and lawful manner.

**Dr. Kerr's Account Is Churned**

22.    Churning occurs when a broker engages in excessive buying and selling of securities in a customer's account chiefly to generate commissions that benefit the broker.    For churning to occur, the broker must exercise control over the investment decisions in the

---

[1] Dr. Kerr's initial $733,000 deposit was made through three wire transfers.  The first wire transfer was made on April 14, 2011 in the amount of $250,000.  The second wire transfer was made on April 21, 2011 in the amount of $370,000.  The third wire transfer was made on April 26, 2011 in the amount of $113,000.
[2] Dr. Kerr's second $8,000 cash deposit was made through two wire transfers.  The first wire transfer was made on June 10, 2011 in the amount of $5,000.  The second wire transfer was made on June 16, 2011 in the amount of $3,000.

customer's account, such as through a formal written discretionary agreement. Frequent in-and-out purchases and sales of securities that do not appear necessary to fulfill the customer's investment goals may be evidence of churning. Churning is illegal and unethical.

23. From the moment Dr. Kerr opened his account at John Thomas, Roth and Viglione assumed *de facto* control by frequently buying and selling securities, without disclosing the costs of the trading or the basis for such costs, and engaged in unauthorized trading. Moreover, Respondents did not disclose the other ramifications of executing such a high volume of purchases and sales in his account.

24. In total, from April 2011 through March 2012, an eleven (11) month time period, Respondents earned grossly and unlawfully excessive commissions and fees totaling approximately $263,000 from Dr. Kerr's account. It is clear that Respondents decimated Dr. Kerr's account by excessively trading it for the purpose of generating commissions, in disregard of Dr. Kerr's interests.

25. Roth and Viglione began churning Dr. Kerr's account immediately from the day he opened his account with John Thomas. For example, on the first day Dr. Kerr's account's was opened, April 14, 2011, Roth and Viglione purchased 8,321 shares of Silvercorp Metals Inc. for $124,875 and charged Dr. Kerr $3,575 in sales credits, and purchased 1,983 shares of Youku Com Inc for $124,522 and charged Dr. Kerr $3,575 in sales credits. The very next day, April 15, 2011, Roth and Viglione purchased an additional 25,000 shares of Silvercorp Metals Inc. for $369,727, for which they charged Dr. Kerr an additional commission of $7,575. Astoundingly, within the first two (2) days of Dr. Kerr's account being opened, Respondents earned themselves nearly $15,000 in sales credits by making three (3) purchases in Dr. Kerr's account, which, as will be described below, resulted in damages to Dr. Kerr. Furthermore, at

9

that time Dr. Kerr had only deposited $250,000, yet Respondents purchased approximately $600,000 in securities in Dr. Kerr's account.

26.     During the second week Dr. Kerr's account was opened, on April 21, 2012, Roth and Viglione purchased 5,000 shares of 21Vianet Group Inc. for $112,775 and charged Dr. Kerr $2,875 in commissions. Roth and Viglione also purchased an additional 1,987 shares of Youku Com Inc. for $135,802, and charged Dr. Kerr $3,675 in commissions, even though they had just sold a previous position in Youku Com Inc. two (2) days earlier. During the second week Dr. Kerr's accounts were opened, Respondents earned $6,550 in sales credits/commissions by executing two (2) trades in Dr. Kerr's account.

27.     During the third week of trading, Roth and Viglione continued to implement their unlawful trading pattern of trading for the purpose of generating commissions. By now, Roth and Viglione could tell that Dr. Kerr was not paying attention to trade confirmations or the commissions/costs of the trading, and continued to trade for the purpose of earning commissions. On April 27, 2011, Roth and Viglione purchased 5,000 shares of Rackspace Inc. for $231,724, and charged Dr. Kerr $6,275 in sales credits/commissions. They also purchased 11,500 shares of Sify Technologies Ltd for $86,956, which earned Respondents $2,375 in sales credits/commissions. Also on April 27, 2011, Roth and Viglione sold 9,000 shares of Silvercorp Metals Inc for $119,043, 5,000 shares of 21 Vianet Group Inc. for $81,338 and 1,987 of Youku Com Inc. for $120,254. On April 28, 2012, the next day, Roth and Viglione sold 11,500 shares of Sify Technologies Ltd for $91,648. The sales made by Roth and Viglione during the third trading week earned Respondents approximately $9,500 in commissions.

28.     Roth and Viglione's churning of Dr. Kerr's account did not end there.   Roth and Viglione's churning is also evidenced through the trading of Credit Suisse Nassau S&P 500 VIX short Term Futures ETN ("Credit Suisse S&P 500 VIX ETN") as follows:

| Date | Buy | Value of Buy | Sell | Value of Sale | Sales Credits To Respondents |
|------|-----|--------------|------|---------------|------------------------------|
| 9/13/2011 | 1,000 | $71,815 | | | $1,175 |
| 9/14/2011 | 1,000 | $71,055 | | | $1,175 |
| 9/19/2011 | | | 1,000 | $61,373 | $176 |
| 9/20/2011 | 1,200 | $70,669 | | | $1,225 |
| 9/22/2011 | | | 2,200 | $164,949 | $1,678 |
| 9/26/2011 | 2,500 | $201,948 | | | $3,475 |
| 9/27/2011 | 2,000 | $140,251 | | | $2,311 |
| 9/29/2011 | 1,000 | $76,595 | | | $1,275 |
| 10/3/2011 | 3,000 | $277,575 | | | $4,575 |
| 10/3/2011 | | | 5,500 | $495,430 | $9,084 |
| 10/3/2011 | | | 3,000 | $295,694 | $105 |
| 10/4/2011 | 5,000 | $540,077 | | | $175 |
| 10/4/2011 | | | 2,500 | $242,870 | $179 |
| 10/4/2011 | | | 2,500 | $223,745 | $104 |
| 10/5/2011 | 1,000 | $81,445 | | | $275 |
| 10/6/2011 | 1,000 | $77,694 | | | $675 |
| 10/10/2011 | 2,000 | $144,245 | | | $2,484 |
| 10/13/2011 | | | 2,000 | $116,102 | $177 |
| 10/25/2011 | 1,000 | $54,320 | | | $900 |
| 10/27/2011 | | | 3,000 | $112,630 | $177 |
| TOTAL: | 21,700 | $1,807,690 | 21,700 | $1,712,797 | $31,404 |

As demonstrated above, Roth and Viglione executed twelve (12) purchases and eight (8) sales in the same Credit Suisse S&P 500 VIX ETN during a six (6) week period.  This trading caused losses in Dr. Kerr's account of approximately $95,000, yet generated commissions for Respondents in the amount of $31,400.  Moreover, the monthly turnover rate for October 2011 was 13.7.[3]  Clearly, Roth and Viglione were out to churn this account for all that it was worth.

---

[3] A turnover ratio is the total amount of purchases made in the account, divided by the average monthly equity in the account. That ratio is then annualized (by dividing the result by the number of months involved which results in a

29.     Another egregious example of Roth and Viglione's churning is evidenced through the trading of Barclays Bank iPath S&P 500 VIX Short Term Futures Electronic Traded Note ("Barclays S&P 500 VIX ETN") as follows:

| Date | Buy | Value of Buy | Sell | Value Of Sale | Sales Credits To Respondents |
|---|---|---|---|---|---|
| 11/1/2011 | 2,000 | $95,765 | | | $1,625 |
| 11/2/2011 | 2,000 | $91,690 | | | $1,550 |
| 11/7/2011 | 1,000 | $44,935 | | | $775 |
| 11/9/2011 | | | 3,000 | $140,972 | $117 |
| 11/16/2011 | | | 2,000 | $89,123 | $176 |
| 11/23/2011 | 1,875 | $91,175 | | | $1,475 |
| 12/2/2011 | | | 1,100 | $44,066 | $175 |
| 12/15/2011 | | | 775 | $30,119 | $175 |
| TOTAL: | 6,875 | $323,565 | 6,875 | $304,280 | $6,130 |

As demonstrated above, Roth and Viglione executed eight (8) trades in the same Barclays S&P 500 VIX ETN security in one and one-half (1 ½) months which incurred a loss in Dr. Kerr's account of approximately $19,000, yet generated commissions for Respondents in the amount of $6,130. Additionally, the monthly turnover rate for November 2011 was 12.7 and the monthly turnover rate for December 2011 was 13.2. As with the trading in Credit Suisse S&P 500 VIX ETN, it is clear that Roth and Viglione were out to churn Dr. Kerr's account for all that it was worth.

30.     These are just a few of the multitude of examples of Roth and Viglione churning Dr. Kerr's account to generate sales credits for Respondents. In total, from April 2011 through March 2012, an eleven (11) month time period, Dr. Kerr was damaged in excess of $781,000, while Respondents earned excessive commissions and fees totaling approximately $263,000.

per month ratio, and then multiplying that result by 12). An annualized turnover ratio of six (6) means that the equity in the account was invested six (6) times in a year, can be indicative of excessive trading in the typical customer account.

The turnover rate from the time the account was opened until Dr. Kerr stopped the trading, which was from April 2011 through March 2012, was an outstanding 48.71. The annualized equity/cost maintenance for Dr. Kerr's account was 105.98%. A break even or cost to equity maintenance factor is used to determine what the minimum rate of return had to be just to break even, to cover the costs of doing business. As difficult as it may be to understand, that means that for Dr. Kerr to just break even, after expenses, the account would have had to generate a return of 105.98%. It is clear that Respondents decimated Dr. Kerr's account by excessively trading for no other purpose than to generate commissions, in disregard of Dr. Kerr's interest. The turnover rate and equity/cost maintenance figures are staggering and are a clear example of per se churning.

31. A. Belesis, G. Belesis, Catellano, Greenberg, Misiti and Purwin, the control persons of John Thomas, were reckless and/or negligent in failing to properly supervise and maintain Dr. Kerr's account pursuant to FINRA rules and/or John Thomas's compliance procedures. At no time did supervisors at John Thomas, or the control persons of John Thomas, A. Belesis, G. Belesis, Catellano, Greenberg, Misiti and Purwin, contact Dr. Kerr to discuss the trading or churning in his account. Rather, Dr. Kerr only received a general call to see if he was happy with Roth and Viglione. There was no mention of the commission charged or the losses incurred to date. The calls were the exact opposite of what industry standard active account supervisor contact should be. This was a violation by A. Belesis, G. Belesis, Catellano, Greenberg, Misiti and Purwin of John Thomas's compliance procedures, and other rules and regulations that are set to protect customers' assets from being pillaged by brokers, such as Roth and Viglione.

13

32.     As a result of Respondents' unlawful actions, Dr. Kerr was damaged in an amount in excess of $781,000.

**Other Customer Complaints Alleging Churning by Roth and Viglione**

33.     Roth and Viglione's conduct is not surprising when viewed in light of the other customer complaints on their FINRA BrokerCheck Report which both similarly allege churning. For example, in July 2012, a customer complained to Respondents alleged that Roth and Viglione excessively traded the customer's account which resulted in poor performance and a loss of $900,000. This complaint is still pending.

34.     Moreover, in December 2011, a customer filed a FINRA arbitration against John Thomas alleging that Roth and Viglione engaged in unauthorized trading and churning. This case is also still pending. Clearly, Roth and Viglione have a history of defrauding customers by gaining control of their accounts an engaging in churning and unauthorized trading for the purpose of generating hefty commissions without regard for their clients' interests.

**John Thomas and A. Belesis Investigated By Securities Regulators**

35.     Recently, in February 2013, John Thomas and A. Belesis have been the subject of various federal and state securities regulator investigations. Attached hereto as Exhibit A are various news articles highlighting these investigations. Indeed, the Securities and Exchange Commission ("SEC") and the Federal Bureau of Investigation ("FBI") are investigating John Thomas's business practices, particularly the firm's use of cold calling. Similarly, various news articles have highlighted John Thomas's implementation of pump and dump schemes wherein John Thomas and its registered representatives would purchase a certain stock at a chearp price, and thereafter, artificially inflate a stock's price through false and misleading statements. Once the stock price artificially rose as a result of the firm's false and misleading statements, it would

then sell or "dump" the stock at the inflated price. After FINRA investigated the alleged "pump and dump" scheme, it issued a Wells Notice to A. Belesis which stated that FINRA made preliminary determinations to initiate disciplinary proceedings based upon the findings: "(1) that [A. Belesis] willfully or recklessly sold a substantial portion of a [John Thomas] proprietary position while failing to execute customer orders to sell shares of the same stock, at prices that would have satisfied the unexecuted customer orders; (2) that [A. Belesis] failed to follow instructions by the customers to sell the shares; (3) that [A. Belesis used manipulative, deceptive and/or fraudulent means to artificially inflate the price of the stock; (4) that [A. Belesis] made material misrepresentations, to customers, registered representatives and FINRA, about the reasons why the customer orders had not been executed; (5) that it falsified or failed to preserve the orders in question and other pertinent records; and (6) that [A. Belesis] failed to reasonably supervise the receipt, documentation and execution of the customer orders." *See* A. Belesis, FINRA BrokerCheck Report, attached hereto as Exhibit B, page 22.

## DISPUTE, CLAIM OR CONTROVERSY

36.     Pursuant to FINRA Rules 12100(1) and 12200, Respondents are required to arbitrate this dispute, claim or controversy with Dr. Kerr. Specifically, FINRA Rule 12200 states, in pertinent part, as follows:

Parties must arbitrate a dispute under the Code if:

   • Arbitration under the Code is either:
        (1) Required by a written agreement, or
        (2) Requested by the customer;

   • The dispute is between a customer and a member or associated person of a member; and

   • The dispute arises in connection with the business activities of the member or the associated person, except disputes involving the insurance

business activities of a member that is also an insurance company.[4]

Moreover, FINRA Rule 12100(l) defines "dispute" as "a dispute, claim or controversy."

37.     Pursuant to these FINRA rules, John Thomas as a member firm, and Roth, Viglione, A. Belesis, G. Belesis, Catellano, Greenberg, Misiti and Purwin, as associated persons, are required to arbitrate this dispute, claim or controversy arising out of Respondents' sales practice abuses in Dr. Kerr's account. FINRA rules simply do not require Dr. Kerr to plead and/or prove any statutory or common law cause of action or claim.

## CAUSES OF ACTION[5]

### COUNT 1
### SECURITIES FRAUD (1934 ACT AND RULE 10b-5)

38.     Respondents' conduct constitutes a violation of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5, in that Respondents, in connection with the purchase and sale of the securities, engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Dr. Kerr. This conduct included, among other violations:

    a.    executing unauthorized trades;

    b.    employing deceptive, high-pressure sales techniques;

    c.    deceiving Dr. Kerr about the costs of the trading in his account;

    d.    churning; and

    e.    charging excessive markups/markdowns.

---

[4] *See* FINRA Rule 12200, Arbitration Under an Arbitration Agreement of the Rules of FINRA.

[5] While FINRA rules do not require that Claimant plead or prove Causes of Action, Claimant hereby submits these Causes of Action, in addition to the dispute, claim or controversy detailed above.

39.     Dr. Kerr relied to his detriment upon the false representations made by Respondents.

40.     As a proximate consequence of the unlawful conduct of Respondents, Dr. Kerr suffered economic injury.

## COUNT II
## COMMON LAW FRAUD

40.     Respondents committed common law fraud by making numerous factual misrepresentations to Dr. Kerr.

41.     Respondents knew that their representations were false and/or acted in reckless disregard for the truth or falsity of their statements. Further, Respondents acted with scienter; the statements were made to induce Dr. Kerr to maintain his account with Respondents; and Dr. Kerr justifiably relied on these misrepresentations to his detriment.

42.     Dr. Kerr suffered economic injury as the proximate result of Respondents' fraudulent misrepresentations.

43.     Other fraudulent account abuses perpetrated on Dr. Kerr include:

    a.     Roth and Viglione's unauthorized trades and excessive trading in Dr. Kerr's account, which created an unacceptable high risk and is further evidence of excessive control and churning; and

    b.     Respondents failed to properly supervise Dr. Kerr's account and failed to inform him of the high cost of maintaining his account through fees and commissions, and generally was reckless or in gross dereliction of its duties to Dr. Kerr.

44.     As a proximate consequence of the unlawful conduct of Respondents, Dr. Kerr suffered economic injury.

## COUNT III
## NEGLIGENCE, GROSS NEGLIGENCE & NEGLIGENT SUPERVISION

45.     Respondents were negligent and/or grossly negligent with regard to Claimant.

46.     Respondents, by its agents and employees, failed to maintain and enforce a reasonably adequate supervisory system of internal supervision and control over Roth and Viglione, and therefore, did induce, participate in, approve and accept the benefits of the fraudulent and deceptive schemes and practices that occurred.

47.     The negligence, gross negligence and/or negligent supervision of Respondents included their failure to educate, supervise and properly direct their agents and employees. Respondents were negligent and/or grossly negligent with regard to Claimant by the following:

    a.     Failing to provide Dr. Kerr with appropriate investment opportunities;

    b.     Failing to advise and counsel Dr. Kerr in a timely, truthful and consistent manner;

    c.     Excessively trading Dr. Kerr's account to generate commissions and fees;

    d.     Failing to adequately advise Dr. Kerr of the risks involved in churning his account, and

    e.     Otherwise failing to provide investment services and advice in accordance with the Respondents' fiduciary duties.

48.     As a direct and proximate result of the negligence and/or gross negligence of Respondents, Claimant has been injured and damaged.

## COUNT IV
## BREACH OF CONTRACTUAL AND LEGAL DUTIES

49.     Respondents were obligated to provide Dr. Kerr with competent professional services in accordance with applicable industry rules, regulations, customs and practices and to deal with him fairly and in good faith.  Such obligations were mandated by the very nature of Respondents' business, business affiliations and contractual undertaking for Dr. Kerr.

50.     As members of FINRA, and various other exchanges, Respondents were obligated to conduct business in accordance with various industry rules, regulations, customs and practices.  Among the obligations Respondents owed Dr. Kerr under industry rules, regulations, customer practices and standards were the following:

- The following sections of the FINRA Conduct Rules of Fair Practice:
  - Section 2150, High Standards of Commercial Honor and Just and Equitable Principles of Trade;
  - Section 2120, Use of Malpractice, Deceptive or other Fraudulent Devices;
  - Section 2440, Fair Prices and Commissions;
  - Section 2510, Discretionary Authority; and
  - Section 3010, Supervision of Representatives.

51.     Respondents violated each of the foregoing duties and standards by directing the transactions in Dr. Kerr's account.

## COUNT V
## FAILURE TO SUPERVISE

52.     A. Belesis, G. Belesis, Catellano, Greenberg, Misiti and Purwin are control persons under Section 20 of the 1934 Act, and as such, are jointly and severally liable for the

19

actions of their brokers, such as Roth, under their supervision. Respondents failed to reasonably supervise Roth and Viglione in connection with Dr. Kerr's investments and thereby, breached their contractual and legal duties to him.

53.     As a result of Respondents' violations, Claimant has suffered damages as indicated herein and can recover from Respondents.

**COUNT VI**
**RESPONDEAT SUPERIOR**

54.     Under the theory of Respondeat Superior, Respondents are liable for the acts of Roth, its employee, while he acted within the scope of his employment.

55.     Roth and Viglione's fraudulent actions, which caused damage to Dr. Kerr, occurred while he was acting within the scope of his employment by Respondents.

56.     Accordingly, Respondents are liable for damages to Dr. Kerr under the theory of Respondeat Superior.

**COUNT VII**
**"CONTROL PERSON" LIABILITY**

57.     Officers, Principals and/or Managers of John Thomas, directly and/or indirectly, controlled Roth and Viglione who are liable for the causes of action detailed herein, and therefore, shall be liable jointly and severally with and to the same extent as Roth and Vioglione are to Dr. Kerr. A. Belesis, G. Belesis, Catellano, Greenberg, Misiti and Purwin are not only liable as a "control persons" of Roth and Viglione, but also, for John Thomas's fraudulent sales practices abuses. Moreover, upon information and belief, A. Belesis, G. Belesis, Catellano, Greenberg, Misiti and Purwin was a meaningful participant in the securities fraud perpetrated on Claimants by Roth and Viglione.

58.     Therefore, A. Belesis, G. Belesis, Catellano, Greenberg, Misiti and Purwin, as

control persona of John Thomas, are liable for the damages incurred by Dr. Kerr.

## CONCLUSION

59.     Based on the foregoing, Dr. Kerr demands judgment against Respondents, as follows:

a.     Awarding compensatory damages in favor of Dr. Kerr against Respondents, for all damages sustained as a result of the wrongdoing, in an amount in excess of $780,000, as well as interest, where applicable;

b.     For interest to run until the date that the award is fully paid and satisfied by John Thomas;

c.     Awarding the disgorgement of fees, commissions and compensation earned from Dr. Kerr's account;

d.     Awarding Dr. Kerr all reasonable attorneys' fees, expenses and costs, including experts' fees;

e.     Awarding rescission; and

f.     Awarding such additional equitable or other relief as deemed appropriate by the Arbitration Panel.

Dated: New York, New York
      February 20, 2013

                                 LAX & NEVILLE LLP

                                 Brian J. Neville, Esq.
                                 Gabrielle J. Pretto, Esq.
                                 1450 Broadway, 35th Floor
                                 New York, NY 10018
                                 Tel: (212) 696-1999
                                 *Attorneys for Claimant Dr. Eubulus J. Kerr, III*

A

**NEW YORK POST**

# John Thomas Financial being probed by brokerage industry, SEC and FBI

By KAJA WHITEHOUSE
*Last Updated:* 3:43 PM, February 7, 2013
*Posted:* 12:16 AM, February 7, 2013

Wall Street brokerage firm John Thomas Financial, owned by flamboyant founder and CEO Tommy Belesis — who gained more than 15 minutes of fame from his role in Oliver Stone's "Wall Street: Money Never Sleeps" — is being probed by the brokerage industry, the Securities and Exchange Commission and the FBI, The Post has learned.

Agents from the FBI's New York office have been knocking on doors of people associated with the firm, asking questions about JTF's business practices, including cold calling by brokers and Belesis' overseas accounts, sources told The Post.

"They were throwing a huge net," said a person who was interviewed by the FBI about JTF and asked not to be named.

An FBI spokeswoman declined to comment.

The G-men also inquired about JTF's dealings with Sam Waksal, the founder and former CEO of ImClone Systems who spent five years in prison after pleading guilty to an insider-trading scandal that entangled domestic diva Martha Stewart in 2003.

After being released from prison, Waksal founded Kadmon Pharmaceuticals, a privately held drug company that hired JTF to help it raise money.

The feds have asked whether Waksal recommended JTF buy shares of drugmaker Inhibitex weeks before its shares rose more than 150 percent after

Bristol-Myers Squibb announced a deal to buy it for $26 a share.

Waksal, who has no official ties to Inhibitex, didn't deny he made the recommendation but said the takeover offer was widely expected as it was part of industry chatter at the time.

"Everyone in biotech was discussing hepatitis C medicine at that time," Waksal said in a statement to The Post. "There were countless media and analyst reports about value and M&A in this space following the Pharmasset buyout in 2011. Inhibitex and others are mentioned regularly, something a quick Google search makes obvious."

JTF dismissed the FBI probe as the "fabrications" of an ex-employee who it recently sued for $20 million.

"Based on the subject of this story, we believe the source of these fabrications is a disgruntled former recruiter, a fraudster whose unethical behavior resulted in his termination for cause," the company said in an e-mailed statement.

The FBI has also been poking around JTF's dealings with Grandparents.com, which hired JTF last year to help it with a stock deal. The agents have asked whether JTF brokers told prospective buyers of the stock that media personality Regis Philbin had ties to the penny-stock company, sources said.

Separately, the Financial Industry Regulatory Authority, the brokerage industry's self-regulatory body, has been looking at the brokerage firm's dealings in a small Salt Lake City coal company that hired JTF in 2011 to help raise capital, said a source.

In 2012, Belesis sought to take "operational control" of the coal company, America West Resources, after its shares fell 90 percent, to 20 cents.

The attempted takeover fell apart amid an ugly legal battle with the banker Belesis hired to work on the deal.

Both Finra and the SEC have been in talks with JTF about their respective probes, sources said.

JTF declined to comment on the Finra or SEC talks. No charges have been brought.

A spokeswoman for Finra declined to comment, as did the SEC.

kwhitehouse@nypost.com

NEW YORK POST is a registered trademark of NYP Holdings, Inc.

nypost.com , nypostonline.com , and newyorkpost.com are trademarks of NYP Holdings, Inc.

Copyright 2013 NYP Holdings, Inc. All rights reserved. Privacy | Terms of Use

PRINT FORMAT SPONSORED BY

**COMMONWEALTH**
*financial network*
Helping independent financial advisors
pursue their vision for success



**InvestmentNews
The Leading News Source for Financial Advisers**

# Belesis firm drops suit against ex-reps claiming 'pump and dump' scheme

## Defendants' attorney calls media darling's conduct 'venomous'

By Bruce Kelly

February 8, 2013

**InvestmentNews
Reprints**

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers, use the Reprints tool or the Reprints link at the top or bottom of any article, respectively.

- View reprint options
- Order a reprint article now

John Thomas Financial Inc. has withdrawn from a lawsuit it filed in January against five ex-brokers, according to the ex-brokers' attorney.

In January, John Thomas, which is run by chief executive and owner Anastasios "Tommy" Belesis, sued the five ex-brokers, along with National Securities Corp., the firm they joined.

The brokers named in the suit, which was filed in State Court in Manhattan, are Renos Gordos, Rodney Laveau, Anthony Mauiolo, Darren Himmelstein and Keith Williams. John Thomas alleged in the complaint that the five brokers, who left in December, used stolen proprietary information to lure away customers, costing John Thomas more than $10 million.

According to affidavits filed in response to the lawsuit, John Thomas, through Mr. Belesis, promoted at least one "pump and dump" stock scheme and recently filed a complaint with the New York City Police Department against the ex-brokers, claiming that the brokers engaged in theft of property and fraud.

Mr. Belesis and other principals of John Thomas use promoters to present securities and companies to the firm's representatives to get the brokers to sell the securities to increase the price of the shares. At the same time, the firm instructs promoters to sell into the market, according to the affidavits.

One example of a "pump and dump" scheme occurred with Liberty Silver Corp., a company that John Thomas recommended to its clients, according to the affidavits.

Mr. Belesis "runs a boiler room operation like a tyrant," hollering and screaming at reps during the day, according to the brokers' testimony. "He tells registered reps to essentially ignore their client's investment objectives and tries to push securities on clients that are far from appropriate."

Richard Roth, the brokers' attorney, said he was appalled at the brokers' treatment by John Thomas. "John Thomas' aggressive action was astonishing," Mr. Roth said. "I have never seen such venomous conduct in my career."

He added that John Thomas withdrew the case this week. Mr. Belesis did not return calls seeking comment.

Troubles continue to mount for Mr. Belesis and his firm. On Thursday, the New York Post reported that John Thomas was under investigation by the FBI, the Securities and Exchange Commission and the Financial Industry Regulatory Authority Inc. for alleged misconduct in selling stock.

Mr. Belesis admonished brokers not to read private-placement memoranda and screamed at reps to "just sell" the deals, according to the brokers' affidavits. If brokers were not doing sufficient business, they were told to "kill themselves," according to the court documents.

Securities regulators have turned their attention to Liberty Silver, a mineral exploration company that trades on pink sheets. It traded at a high of $1.55 per share Oct. 4 before the SEC suspended trading in the stock for two weeks "because of a lack of current and accurate information about the company concerning, among other things, the control of its stock, its market price and trading in the stock," according to the SEC. When trading in Liberty Silver resumed, the price fell to $0.15. On Thursday, the company's shares traded at $0.39.

Mr. Belesis is a frequent guest on the Fox Business channel and appeared in Oliver Stone's 2010 sequel to the film "Wall Street."



Reproductions and distribution of the above news story are strictly prohibited. To order reprints and/or request permission to use the article in full or partial format please contact our Reprint Sales Manager at (732) 723-0569.



PRINT FORMAT SPONSORED BY

**COMMONWEALTH** *financial network*

Helping independent financial advisors
pursue their vision for success

# Belesis got Wells notice from Finra

Regulator claims owner of Wall Street B-D ran a pump and dump operation

By Bruce Kelly

February 13, 2013

**InvestmentNews Reprints**

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers, use the Reprints tool or the Reprints link at the top or bottom of any article, respectively.

- View reprint options
- Order a reprint article now

The Financial Industry Regulatory Authority Inc. is investigating Anastasios "Tommy" Belesis, the owner and chief executive of John Thomas Financial, for his role in alleged pump-and-dump stock scheme.

Last month, Finra sent Mr. Belesis a Wells notice, according to his profile on BrokerCheck. A Wells notice from Finra signifies that the self-regulator may commence disciplinary proceedings.

Finra alleges that Mr. Belesis, a regular guest on the Fox Business Channel, employed manipulative and potentially fraudulent means to buy and sell stock, the earmarks of a pump-and-dump scheme.

Mr. Belesis "willfully or recklessly sold a substantial portion of a firm proprietary position while failing to execute customer orders to sell shares of the same stock at prices that would have satisfied the unexecuted orders," according to BrokerCheck. He also allegedly "failed to follow instructions by the customers to sell the shares." In addition, Finra claims the John Thomas CEO artificially inflated the price of stock.

"Finra staff has advised that it intends to recommend that a proceeding be brought making allegations along the lines set forth in the notification," said John Thomas spokesman David Pitts. "It is the policy of John Thomas Financial not to comment on pending regulatory matters. If a proceeding is brought, JTF intends to vigorously contest and defend the matter."

Last week, the New York Post reported that Mr. Belesis was under investigation by the FBI, the Securities and Exchange Commission and Finra. InvestmentNews also reported that several ex-brokers of John Thomas Financial had filed court affidavits stating that Mr. Belesis ran a pump-and-dump stock scheme. The alleged scheme involved Liberty Silver Corp., a penny stock that the SEC ordered to stop trading for two weeks in October.

Those court filings were part of a response to a lawsuit filed against the brokers by John Thomas.

Meanwhile, management at John Thomas believes "there is not a stitch of evidence that any sort of Justice Department inquiry is ongoing," Mr. Pitts said. "No one at JTF has been contacted."

"We doubt the Justice Department is in the habit of leaking inquiries, and, if an inquiry was going to be leaked, that it would be to the New York Post," he said. "Notably, the Post does not state that its source is anyone in the Justice Department. JTF has reason to believe that a disgruntled former employee, who was terminated for cause at JTF's request for improper conduct, is at the root of this rumor. JTF is taking appropriate legal action against him."

Finra also alleged that Mr. Belesis made "material misrepresentations to customers, registered reps and Finra about the reasons why the customer orders had not been executed." The industry regulator also accused the firm of falsifying or failing to keep pertinent records of the stock orders in question.

Meanwhile, some members of John Thomas' investment banking team have left the firm to work under the aegis of another small New York brokerage, Corinthian Partners LLC. Avi Mirman, the former managing director of investment banking at the now-defunct GunnAllen Financial Inc., joined Corinthian Partners on Friday.

John Thomas has strong connections to Corinthian Partners. Mr. Belesis' brother, George, is president of John Thomas but also a minority owner of Corinthian Partners through an outside holding company. Tommy Belesis has no stake in Corinthian.

The two firms are close in other ways, as well. Corinthian Partners now occupies space in John Thomas' offices at 14 Wall St. "I think they're trying to slither away to Corinthian," said Richard Roth, an attorney who represented the ex-John Thomas brokers in the suit. Mr. Roth said the suit was dropped. Mr. Pitts said it had not been dropped.

John Thomas' problems will likely drag on, Mr. Roth said. "I don't think the Wells notice is the end of the investigation."



Reproductions and distribution of the above news story are strictly prohibited. To order reprints and/or request permission to use the article in full or partial format please contact our Reprint Sales Manager at (732) 723-0569.

B



**BrokerCheck Report**

# ANASTASIOS P BELESIS

CRD# 2707354

Report #83956-56186, data current as of Tuesday, February 19, 2013.

| Section Title | Page(s) |
| --- | --- |
| Report Summary | 1 |
| Broker Qualifications | 2 - 5 |
| Registration and Employment History | 6 - 7 |
| Disclosure Events | 8 |



**About BrokerCheck®**

BrokerCheck offers information on all current-and many former-FINRA-registered securities brokers, and all current and former FINRA-registered securities firms. FINRA strongly encourages investors to use BrokerCheck to check the background of securities brokers and brokerage firms before deciding to conduct, or continue to conduct, business with them.

- **What is included in a BrokerCheck report?**
  BrokerCheck reports for individual brokers include information such as employment history, professional qualifications, disciplinary actions, criminal convictions, civil judgments and arbitration awards. BrokerCheck reports for brokerage firms include information on a firm's profile, history, and operations, as well as many of the same disclosure events mentioned above.
  Please note that the information contained in a BrokerCheck report may include pending actions or allegations that may be contested, unresolved or unproven. In the end, these actions or allegations may be resolved in favor of the broker or brokerage firm, or concluded through a negotiated settlement with no admission or finding of wrongdoing.
- **Where did this information come from?**
  The information contained in BrokerCheck comes from FINRA's Central Registration Depository, or CRD® and is a combination of:
    o information FINRA and/or the Securities and Exchange Commission (SEC) require brokers and brokerage firms to submit as part of the registration and licensing process, and
    o information that regulators report regarding disciplinary actions or allegations against firms or brokers.
- **How current is this information?**
  Generally, active brokerage firms and brokers are required to update their professional and disciplinary information in CRD within 30 days. Under most circumstances, information reported by brokerage firms, brokers and regulators is available in BrokerCheck the next business day.
- **What if I want to check the background of an investment adviser firm or investment adviser representative?**
  To check the background of an investment adviser firm or representative, you can search for the firm or individual in BrokerCheck. If your search is successful, click on the link provided to view the available licensing and registration information in the SEC's Investment Adviser Public Disclosure (IAPD) website at http://www.adviserinfo.sec.gov. In the alternative, you may search the IAPD website directly or contact your state securities regulator at http://www.nasaa.org.
- **Are there other resources I can use to check the background of investment professionals?**
  FINRA recommends that you learn as much as possible about an investment professional before deciding to work with them. Your state securities regulator can help you research brokers and investment adviser representatives doing business in your state.

**Thank you for using FINRA BrokerCheck.**



Using this site/information means that you accept the FINRA BrokerCheck Terms and Conditions. A complete list of Terms and Conditions can be found at
brokercheck.finra.org



For additional information about the contents of this report, please refer to the User Guidance or www.finra.org/brokercheck. It provides a glossary of terms and a list of frequently asked questions, as well as additional resources. For more information about FINRA, visit www.finra.org.



## ANASTASIOS P. BELESIS
CRD# 2707354

**Currently employed by and registered with the following FINRA Firm(s):**

**JOHN THOMAS FINANCIAL**
14 WALL STREET 23RD FLOOR
NEW YORK, NY 10005
CRD# 40982
Registered with this firm since: 01/12/2007

# Report Summary for this Broker

This report summary provides an overview of the broker's professional background and conduct. Additional information can be found in the detailed report.

## Broker Qualifications

**This broker is registered with:**
* 2 Self-Regulatory Organizations
* 52 U.S. states and territories

Is this broker currently suspended or inactive with any regulator? No

**This broker has passed:**
* 3 Principal/Supervisory Exams
* 1 General Industry/Product Exam
* 1 State Securities Law Exam

## Registration History

This broker was previously registered with FINRA at the following brokerage firms:

**JOSEPH GUNNAR & CO. LLC**
CRD# 24795
NEW YORK, NY
12/2005 - 01/2007

**S.W. BACH & COMPANY**
CRD# 43522
NEW YORK, NY
11/2003 - 12/2005

**HARRISON SECURITIES, INC.**
CRD# 14103
PORT WASHINGTON, NY
09/2001 - 12/2003

## Disclosure Events

Disclosure events are certain criminal matters; regulatory actions; civil judicial proceedings; customer complaints, arbitrations, or civil litigations; employment terminations; and financial matters in which the broker has been involved.

Are there events disclosed about this broker? Yes

**The following types of disclosures were reported:**

Investigation

Customer Dispute

Termination

## Broker Qualifications



### Registrations

This section provides the self-regulatory organizations (SROs) and U.S. states/territories the broker is currently registered and licensed with, the category of each registration, and the date on which the registration became effective. This section also provides, for every brokerage firm with which the broker is currently employed, the address of each branch where the broker works.

**This individual is currently registered with 2 SROs and is licensed in 52 U.S. states and territories through his or her employer.**

### Employment 1 of 1

| | |
|---|---|
| Firm Name: | **JOHN THOMAS FINANCIAL** |
| Main Office Address: | **14 WALL STREET**<br>**23RD FLOOR**<br>**NEW YORK, NY 10005** |
| Firm CRD#: | **40982** |

| SRO | Category | Status | Date |
|---|---|---|---|
| FINRA | General Securities Principal | APPROVED | 01/12/2007 |
| FINRA | General Securities Representative | APPROVED | 01/12/2007 |
| FINRA | General Securities Sales Supervisor | APPROVED | 01/12/2007 |
| FINRA | Investment Banking Representative | APPROVED | 01/26/2010 |
| FINRA | Operations Professional | APPROVED | 12/01/2011 |
| NASDAQ Stock Market | General Securities Principal | APPROVED | 03/12/2009 |
| NASDAQ Stock Market | General Securities Representative | APPROVED | 03/12/2009 |
| NASDAQ Stock Market | General Securities Sales Supervisor | APPROVED | 03/12/2009 |

| U.S. State/ Territory | Category | Status | Date | U.S. State/ Territory | Category | Status | Date |
|---|---|---|---|---|---|---|---|
| Alabama | Agent | APPROVED | 02/06/2007 | Connecticut | Agent | APPROVED | 01/18/2007 |
| Alaska | Agent | APPROVED | 03/09/2007 | Delaware | Agent | APPROVED | 02/09/2007 |
| Arizona | Agent | APPROVED | 01/30/2008 | District of Columbia | Agent | APPROVED | 02/06/2007 |
| Arkansas | Agent | APPROVED | 01/17/2007 | | | | |
| California | Agent | APPROVED | 01/12/2007 | Florida | Agent | APPROVED | 01/16/2008 |
| | | | | Georgia | Agent | APPROVED | 01/17/2007 |
| Colorado | Agent | APPROVED | 03/10/2008 | | | | |
| | | | | Hawaii | Agent | APPROVED | 09/02/2009 |

## Broker Qualifications



### Employment 1 of 1, continued

| U.S. State/ Territory | Category | Status | Date | U.S. State/ Territory | Category | Status | Date |
|---|---|---|---|---|---|---|---|
| Idaho | Agent | APPROVED | 02/09/2007 | Pennsylvania | Agent | APPROVED | 01/16/2007 |
| Illinois | Agent | APPROVED | 01/17/2007 | Puerto Rico | Agent | APPROVED | 02/12/2007 |
| Indiana | Agent | APPROVED | 01/31/2007 | Rhode Island | Agent | APPROVED | 01/31/2008 |
| Iowa | Agent | APPROVED | 01/30/2007 | South Carolina | Agent | APPROVED | 01/16/2007 |
| Kansas | Agent | APPROVED | 01/23/2008 | South Dakota | Agent | APPROVED | 01/18/2007 |
| Kentucky | Agent | APPROVED | 01/16/2007 | Tennessee | Agent | APPROVED | 08/13/2007 |
| Louisiana | Agent | APPROVED | 02/27/2007 | Texas | Agent | APPROVED | 01/18/2007 |
| Maryland | Agent | APPROVED | 01/12/2007 | Utah | Agent | APPROVED | 08/05/2009 |
| Massachusetts | Agent | APPROVED | 03/19/2007 | Vermont | Agent | APPROVED | 09/22/2009 |
| Michigan | Agent | APPROVED | 01/25/2008 | Virgin Islands | Agent | APPROVED | 07/27/2009 |
| Minnesota | Agent | APPROVED | 01/16/2007 | Virginia | Agent | APPROVED | 01/17/2008 |
| Mississippi | Agent | APPROVED | 01/17/2007 | Washington | Agent | APPROVED | 02/06/2007 |
| Missouri | Agent | APPROVED | 01/25/2007 | West Virginia | Agent | APPROVED | 02/12/2007 |
| Montana | Agent | APPROVED | 04/04/2007 | Wisconsin | Agent | APPROVED | 04/15/2008 |
| Nebraska | Agent | APPROVED | 01/30/2007 | Wyoming | Agent | APPROVED | 01/26/2007 |
| Nevada | Agent | APPROVED | 01/16/2007 | | | | |
| New Hampshire | Agent | APPROVED | 01/21/2011 | | | | |
| New Jersey | Agent | APPROVED | 01/16/2007 | | | | |
| New Mexico | Agent | APPROVED | 01/22/2007 | | | | |
| New York | Agent | APPROVED | 01/12/2007 | | | | |
| North Carolina | Agent | APPROVED | 01/16/2007 | | | | |
| North Dakota | Agent | APPROVED | 01/18/2007 | | | | |
| Ohio | Agent | APPROVED | 08/11/2009 | | | | |
| Oklahoma | Agent | APPROVED | 02/15/2007 | | | | |
| Oregon | Agent | APPROVED | 01/18/2008 | | | | |



**Employment 1 of 1, continued**

**Branch Office Locations**

**JOHN THOMAS FINANCIAL**
14 WALL STREET 23RD FLOOR
NEW YORK, NY 10005

## Broker Qualifications



### Industry Exams this Broker has Passed

This section includes all securities industry exams that the broker has passed. Under limited circumstances, a broker may attain a registration after receiving an exam waiver based on exams the broker has passed and/or qualifying work experience. Any exam waivers that the broker has received are not included below.

**This individual has passed 3 principal/supervisory exams, 1 general industry/product exam, and 1 state securities law exam.**

#### Principal/Supervisory Exams

| Exam | Category | Date |
|------|----------|------|
| General Securities Sales Supervisor - Options Module Examination | Series 9 | 04/11/2001 |
| General Securities Sales Supervisor - General Module Examination | Series 10 | 06/27/2001 |
| General Securities Principal Examination | Series 24 | 12/22/1998 |

#### General Industry/Product Exams

| Exam | Category | Date |
|------|----------|------|
| General Securities Representative Examination | Series 7 | 04/26/1996 |

#### State Securities Law Exams

| Exam | Category | Date |
|------|----------|------|
| Uniform Securities Agent State Law Examination | Series 63 | 03/26/1996 |

Additional information about the above exams or other exams FINRA administers to brokers and other securities professionals can be found at www.finra.org/brokerqualifications/registeredrep/.



# Registration and Employment History

## Registration History

This broker previously was registered with FINRA at the following firms:

| Registration Dates | Firm Name | CRD# | Branch Location |
|---|---|---|---|
| 12/2005 - 01/2007 | JOSEPH GUNNAR & CO. LLC | 24795 | NEW YORK, NY |
| 11/2003 - 12/2005 | S.W. BACH & COMPANY | 43522 | NEW YORK, NY |
| 09/2001 - 11/2003 | HARRISON SECURITIES, INC. | 14103 | PORT WASHINGTON, NY |
| 08/1998 - 10/2001 | LADENBURG CAPITAL MANAGEMENT INC. | 14623 | BETHPAGE, NY |
| 07/1996 - 08/1998 | FIRST ASSET MANAGEMENT INC. | 17341 | GARDEN CITY, NY |

## Employment History

Below is the broker's employment history for up to the last 10 years.

**Please note that the broker is required to provide this information only while registered with FINRA and the information is not updated after the broker ceases to be registered. Therefore, an employment end date of "Present" may not reflect the broker's current employment status.**

| Employment Dates | Employer Name | Employer Location |
|---|---|---|
| 01/2007 - Present | ATB HOLDING COMPANY, LLC | NEW YORK, NY |
| 01/2007 - Present | JOHN THOMAS FINANCIAL | NEW YORK, NY |
| 12/2005 - 01/2007 | JOSEPH GUNNAR & CO. INC. | NEW YORK, NY |
| 11/2003 - 12/2005 | SW BACH & COMPANY | NEW YORK, NY |
| 09/2001 - 11/2003 | HARRISON SECURITIES INC | PORT WASHINGTON, NY |

## Other Business Activities

This section includes information, if any, as provided by the broker regarding other business activities the broker is currently engaged in either as a proprietor, partner, officer, director, employee, trustee, agent or otherwise. This section does not include non-investment related activity that is exclusively charitable, civic, religious or fraternal and is recognized as tax exempt.

MANAGING MEMBER, - ATB HOLDING COMPANY LLC ("ATB") - FORMED IN SEPTEMBER 2006 AND IS LOCATED AT 14 WALL STREET,23RD FLOOR NY, NY 10005. ATB IS A HOLDING COMPANY FOR FINANCIAL COMPANIES AND OTHER GENERAL BUSINESSES INCLUDING THE FOLLOWING:
JOHN THOMAS FINANCIAL, INC;
FOUR POINTS CAPITAL PARTNERS, LLC; AND
JOHN THOMAS GLOBAL, LLC;

## Registration and Employment History



### Other Business Activities, continued

SEPARATE HOLDING COMPANIES INCLUDE:
ATB HOLDINGS II, LLC (OWNS JTF INSURANCE AGENCY);
ATB HOLDINGS III, LLC (OWNS JTF PRIVATE WEALTH MANAGEMENT, LLC)
AGJ HOLDING;
MPB HOLDING;
APB HOLDINGS, LLC (OWNS JOHN THOMAS GLOBAL WEALTH MANAGEMENT, LLC);
JOHN THOMAS GLOBAL TRADING DMCC;
AND CYLLENE LTD.

OTHER THAN JOHN THOMAS FINANCIAL WHICH I AM THE CEO OF, ALL OF THE ABOVE ARE EITHER
DORMANT OR OPERATED BY HIRED PERSONNEL. I WORK FULL TIME FOR JOHN THOMAS FINANCIAL AND
SPEND FIVE TO TEN HOURS A WEEK ON AN AS-NEEDED-BASIS TENDING TO MATTERS INVOLVING ATB'S
SUBSIDIARY COMPANIES. JOHN THOMAS FINANCIAL, INC.; FOUR POINTS CAPITAL PARTNERS, LLC; JTF
PRIVATE WEALTH MANAGEMENT, LLC ARE INVESTMENT RELATED BUSINESSES. I AM A MEMBER OF THE
SCREEN ACTORS GUILD ON A PROJECT BASIS WHICH IS NOT INVESTMENT RELATED. I SERVE ON THE
BOARD OF TRUSTEES FOR THE NEW YORK INSTITUTE OF ENERGY & WATER. I SERVICE AS A SPECIAL
ADVISOR FOR WAFUNIF: "FORMER UN INTERNES AND FELLOWS", A NON-GOVERNMENT ORGANIZATION; I
SERVE AS CHAIRMAN AND VICE PRESIDENT OF THE GLOBAL MILLENNIUM DEVELOPMENT FOUNDATION. IN
ADDITION, I SERVE AS CO-CHAIRMAN FOR THE NEW YORK STATE REPUBLIC AND FINANCE COMMITTEE AND
ON THE EXECUTIVE BOARD MEMBER OF THE WORLD ENERGY FORUM.

## Disclosure Events



**What you should know about reported disclosure events:**

1. Disclosure events are certain criminal matters; regulatory actions; civil judicial proceedings; customer complaints, arbitrations, or civil litigations; employment terminations; and financial matters in which the broker has been involved.

2. **Certain thresholds must be met before an event is reported to CRD, for example:**
   - A law enforcement agency must file formal charges before a broker is required to report a particular criminal event.
   - A customer dispute must involve allegations that a broker engaged in activity that violates certain rules or conduct governing the industry and that the activity resulted in damages of at least $5,000.

3. **Disclosure events in BrokerCheck reports come from different sources:**
   - As mentioned at the beginning of this report, information contained in BrokerCheck comes from brokers, brokerage firms and regulators. When more than one of these sources reports information for the same disclosure event, all versions of the event will appear in the BrokerCheck report. The different versions will be separated by a solid line with the reporting source labeled.

4. **There are different statuses and dispositions for disclosure events:**
   - A disclosure event may have a status of *pending, on appeal,* or *final.*
     - A "pending" disclosure event involves allegations that have not been proven or formally adjudicated.
     - A disclosure event that is "on appeal" involves allegations that have been adjudicated but are currently being appealed.
     - A "final" disclosure event has been concluded and its resolution is not subject to change.
   - A final disclosure event generally has a disposition of *adjudicated, settled* or *otherwise resolved.*
     - An "adjudicated" matter includes a disposition by (1) a court of law in a criminal or civil matter, or (2) an administrative panel in an action brought by a regulator that is contested by the party charged with some alleged wrongdoing.
     - A "settled" matter generally represents a disposition wherein the parties involved in a dispute reach an agreement to resolve the matter. Please note that brokers and brokerage firms may choose to settle customer disputes or regulatory matters for business or other reasons.
     - A "resolved" matter usually includes a disposition wherein no payment is made to the customer or there is no finding of wrongdoing on the part of the individual broker. Such matters generally involve customer disputes.

**For your convenience, below is a matrix of the number and status of disclosure events involving this broker. Further information regarding these disclosure events can be found in the subsequent pages of this report. You also may wish to contact the broker to obtain further information regarding the disclosure events.**



| | Pending | Final | On Appeal |
|---|---|---|---|
| Customer Dispute | 0 | 5 | N/A |
| Investigation | 1 | N/A | N/A |
| Termination | N/A | 1 | N/A |

©2013 FINRA. All rights reserved.    Report# 83956-56186 about ANASTASIOS P. BELESIS. Data current as of Tuesday, February 19, 2013.



## Disclosure Event Details

When evaluating this information, please keep in mind that a disclosure event may be pending or involve allegations that are contested and have not been resolved or proven. The disclosure event may, in the end, be withdrawn, dismissed, resolved in favor of the broker, or concluded through a negotiated settlement for certain business reasons (e.g., to maintain customer relationships or to limit the litigation costs associated with disputing the allegations) with no admission or finding of wrongdoing.

This report provides the information exactly as it was reported to CRD and therefore some of the specific data fields contained in the report may be blank if the information was not provided to CRD.

### Customer Dispute - Award/Judgment

This type of disclosure event involves a final, consumer-initiated, investment-related arbitration or civil suit containing allegations of sales practice violations against the broker that resulted in an arbitration award or civil judgment for the customer.

#### Disclosure 1 of 1

| | |
|---|---|
| **Reporting Source:** | Regulator |
| **Employing firm when activities occurred which led to the complaint:** | |
| **Allegations:** | CHURNING, SUITABILITY, COMMON LAW FRAUD, BREACH OF CONTRACT, BREACH OF FIDUCIARY DUTY, NEGLIGENCE |
| **Product Type:** | Other |
| **Other Product Type(s):** | STOCKS |
| **Alleged Damages:** | $817,800.00 |

### Arbitration Information

| | |
|---|---|
| **Arbitration/Reparation Claim filed with and Docket/Case No.:** | NASD - CASE #01-06394 |
| **Date Notice/Process Served:** | 11/27/2001 |
| **Arbitration Pending?** | No |
| **Disposition:** | Award |
| **Disposition Date:** | 05/05/2003 |
| **Disposition Detail:** | RESPONDENT IS LIABLE, JOINTLY AND SEVERALLY, AND SHALL PAY CLAIMANTS COMPENSATORY DAMAGES IN THE SUM OF $258,940.00, PLUS |



INTEREST.

| | |
|---|---|
| **Reporting Source:** | Firm |
| **Employing firm when activities occurred which led to the complaint:** | LADENBURG CAPITAL MANAGEMENT INC. |
| **Allegations:** | CHURNING, SUITABILITY, COMMON LAW FRAUD, BREACH OF CONTRACT, BREACH OF FIDUCIARY DUTY |
| **Product Type:** | Equity - OTC |
| **Alleged Damages:** | $750,000.00 |

## Customer Complaint Information

| | |
|---|---|
| **Date Complaint Received:** | 05/25/2001 |
| **Complaint Pending?** | No |
| **Status:** | Arbitration/Reparation |
| **Status Date:** | 12/17/2001 |
| **Settlement Amount:** | |
| **Individual Contribution Amount:** | |

## Arbitration Information

| | |
|---|---|
| **Arbitration/Reparation Claim filed with and Docket/Case No.:** | NASD-DR ARBITRATION NUMBER 01-06394 |
| **Date Notice/Process Served:** | 12/17/2001 |
| **Arbitration Pending?** | No |
| **Disposition:** | Award to Customer |
| **Disposition Date:** | 05/05/2003 |
| **Monetary Compensation Amount:** | $258,940.00 |
| **Individual Contribution Amount:** | $0.00 |
| **Summary:** | THE PANEL'S AWARD IS JOINT AND SEVERAL AGINST GBI/LADENBURG CAPITAL MANAGEMENT AND ANASTASIOS BELESIS. |



| | |
|---|---|
| **Reporting Source:** | Broker |
| **Employing firm when activities occurred which led to the complaint:** | GBI CAPITAL PARTNERS, INC. |
| **Allegations:** | EXCESSIVE TRADING |
| **Product Type:** | Equity - OTC |
| **Alleged Damages:** | $750,000.00 |

## Customer Complaint Information

| | |
|---|---|
| **Date Complaint Received:** | 05/25/2001 |
| **Complaint Pending?** | No |
| **Status:** | Arbitration/Reparation |
| **Status Date:** | 05/15/2003 |
| **Settlement Amount:** | |
| **Individual Contribution Amount:** | |

## Arbitration Information

| | |
|---|---|
| **Arbitration/Reparation Claim filed with and Docket/Case No.:** | NASD-DR ARBITRATION 01-06394 |
| **Date Notice/Process Served:** | 12/17/2001 |
| **Arbitration Pending?** | No |
| **Disposition:** | Award to Customer |
| **Disposition Date:** | 05/05/2003 |
| **Monetary Compensation Amount:** | $258,940.00 |
| **Individual Contribution Amount:** | $0.00 |



## Customer Dispute - Settled

This type of disclosure event involves a consumer-initiated, investment-related complaint, arbitration proceeding or civil suit containing allegations of sale practice violations against the broker that resulted in a monetary settlement to the customer.

### Disclosure 1 of 2

| | |
|---|---|
| **Reporting Source:** | Firm |
| **Employing firm when activities occurred which led to the complaint:** | LADENBURG CAPITAL MANAGEMENT INC. |
| **Allegations:** | NEGLIGENCE, MISREPRESENTATION, SUITABILITY AND EXCESSIVE TRADING |
| **Product Type:** | Equity - OTC |
| **Alleged Damages:** | $240,000.00 |

### Customer Complaint Information

| | |
|---|---|
| **Date Complaint Received:** | 01/10/2005 |
| **Complaint Pending?** | No |
| **Status:** | Arbitration/Reparation |
| **Status Date:** | 01/10/2005 |
| **Settlement Amount:** | |
| **Individual Contribution Amount:** | |

### Arbitration Information

| | |
|---|---|
| **Arbitration/Reparation Claim filed with and Docket/Case No.:** | NASD #04-08373 |
| **Date Notice/Process Served:** | 01/10/2005 |
| **Arbitration Pending?** | No |
| **Disposition:** | Settled |
| **Disposition Date:** | 01/20/2006 |
| **Monetary Compensation Amount:** | $62,000.00 |
| **Individual Contribution Amount:** | $25,000.00 |



| | |
|---|---|
| **Reporting Source:** | Broker |
| **Employing firm when activities occurred which led to the complaint:** | LADENBURG CAPITAL MANAGEMENT INC. |
| **Allegations:** | NEGLIGENCE, MISREPRESENTATION, SUITABILITY AND EXCESSIVE TRADING. |
| **Product Type:** | Equity-OTC |
| **Alleged Damages:** | $240,000.00 |
| **Is this an oral complaint?** | No |
| **Is this a written complaint?** | Yes |
| **Is this an arbitration/CFTC reparation or civil litigation?** | Yes |
| **Arbitration/Reparation forum or court name and location:** | NASD |
| **Docket/Case #:** | 04-07752 |
| **Filing date of arbitration/CFTC reparation or civil litigation:** | 12/21/2004 |

## Customer Complaint Information

| | |
|---|---|
| **Date Complaint Received:** | 01/10/2005 |
| **Complaint Pending?** | No |
| **Status:** | Settled |
| **Status Date:** | 01/20/2006 |
| **Settlement Amount:** | $62,000.00 |
| **Individual Contribution Amount:** | $25,000.00 |

## Arbitration Information

| | |
|---|---|
| **Arbitration/CFTC reparation claim filed with (FINRA, AAA, CFTC, etc.):** | NASD |
| **Docket/Case #:** | 04-07752 |



| Date Notice/Process Served: | 01/10/2005 |
| Arbitration Pending? | No |
| Disposition: | Settled |
| Disposition Date: | 01/20/2006 |
| Monetary Compensation Amount: | $62,000.00 |
| Individual Contribution Amount: | $25,000.00 |
| Summary: | THE REPRESENTATIVE AGREED TO SETTLE THE CUSTOMER ARBIRATION WITHOUT ADMITTING ANY WRONGDOING FOR $25000 WHICH, IN HIS OPINION, REPRESENTS A NUISANCE VALUE CONSIDERING THE COST OF LITIGATION. |

## Disclosure 2 of 2

| Reporting Source: | Firm |
| Employing firm when activities occurred which led to the complaint: | LADENBURG CAPITAL MANAGEMENT INC. |
| Allegations: | UNSUITABILITY, OVER-CONCENTRATION |
| Product Type: | Equity - OTC |
| Alleged Damages: | $150,000.00 |

## Customer Complaint Information

| Date Complaint Received: | 01/24/2003 |
| Complaint Pending? | No |
| Status: | Arbitration/Reparation |
| Status Date: | 01/24/2003 |
| Settlement Amount: | |
| Individual Contribution Amount: | |

## Arbitration Information



| | |
|---|---|
| **Arbitration/Reparation Claim filed with and Docket/Case No.:** | NASD CASE NUMBER 02-06612 |
| **Date Notice/Process Served:** | 01/24/2003 |
| **Arbitration Pending?** | No |
| **Disposition:** | Settled |
| **Disposition Date:** | 05/18/2005 |
| **Monetary Compensation Amount:** | $37,500.00 |
| **Individual Contribution Amount:** | $21,250.00 |

......................................................................................................

| | |
|---|---|
| **Reporting Source:** | Broker |
| **Employing firm when activities occurred which led to the complaint:** | LADENBURG CAPITAL MANAGEMENT |
| **Allegations:** | UNSUITABILITY, OVER-CONCENTRATION, EXCESSIVE COMMISSIONS |
| **Product Type:** | Equity - OTC |
| **Alleged Damages:** | $150,000.00 |

## Customer Complaint Information

| | |
|---|---|
| **Date Complaint Received:** | 02/24/2003 |
| **Complaint Pending?** | No |
| **Status:** | Arbitration/Reparation |
| **Status Date:** | 02/26/2003 |
| **Settlement Amount:** | |
| **Individual Contribution Amount:** | |

## Arbitration Information

| | |
|---|---|
| **Arbitration/Reparation Claim filed with and Docket/Case No.:** | NASD CASE NUMER 02-06612 |
| **Date Notice/Process Served:** | 01/24/2003 |

©2013 FINRA. All rights reserved.   Report# 83956-56186 about ANASTASIOS P. BELESIS. Data current as of Tuesday, February 19, 2013.



| | |
|---|---|
| **Arbitration Pending?** | No |
| **Disposition:** | Settled |
| **Disposition Date:** | 05/18/2005 |
| **Monetary Compensation Amount:** | $37,500.00 |
| **Individual Contribution Amount:** | $21,250.00 |



## Customer Dispute - Closed-No Action/Withdrawn/Dismissed/Denied

This type of disclosure event involves (1) a consumer-initiated, investment-related arbitration or civil suit containing allegations of sales practice violations against the individual broker that was dismissed, withdrawn, or denied; or (2) a consumer-initiated, investment-related written complaint containing allegations that the broker engaged in sales practice violations resulting in compensatory damages of at least $5,000; forgery, theft, or misappropriation; or conversion of funds or securities that was closed without action, withdrawn, or denied.

### Disclosure 1 of 2

| | |
|---|---|
| **Reporting Source:** | Broker |
| **Employing firm when activities occurred which led to the complaint:** | S.W. BACH & COMPANY |
| **Allegations:** | CUSTOMER ALLEGES SUITABILITY OF RECOMMEDATIONS BY MR. BELESIS IN ADDITION TO DISSATISFACTION WITH THE PERFORMANCE OF THE INVESTMENTS. |
| **Product Type:** | Equity - OTC |
| **Alleged Damages:** | $130,000.00 |

### Customer Complaint Information

| | |
|---|---|
| **Date Complaint Received:** | 11/17/2005 |
| **Complaint Pending?** | No |
| **Status:** | Denied |
| **Status Date:** | 12/09/2005 |
| **Settlement Amount:** | $0.00 |
| **Individual Contribution Amount:** | $0.00 |

### Disclosure 2 of 2

| | |
|---|---|
| **Reporting Source:** | Broker |
| **Employing firm when activities occurred which led to the complaint:** | S.W. BACH & COMPANY |
| **Allegations:** | CLIENT ALLEGED THOMAS BELESIS FAILED TO ENTER AN 8% STOP LOSS ORDER ON 1000 SHARES OF SIGMATEL INC. |
| **Product Type:** | Equity - OTC |



| Alleged Damages: | $6,400.00 |
| --- | --- |

## Customer Complaint Information

| | |
| --- | --- |
| Date Complaint Received: | 05/14/2005 |
| Complaint Pending? | No |
| Status: | Denied |
| Status Date: | 06/06/2005 |
| Settlement Amount: | |
| Individual Contribution Amount: | |
| Summary: | CLIENT FAILED TO REMIT THE NECESSARY FUNDS FOR THE TRANSACTION AND AS A RESULT THE POSITION WAS SOLD OUT DUE TO NONPAYMENT. |



## Investigation

This type of disclosure event involves any ongoing formal investigation by an entity such as a grand jury state or federal agency, self-regulatory organization or foreign regulatory authority. Subpoenas, preliminary or routine regulatory inquiries, and general requests by a regulatory entity for information are not considered investigations and therefore are not included in a BrokerCheck report.

### Disclosure 1 of 1

| | |
|---|---|
| **Reporting Source:** | Broker |
| **Initiated By:** | FINRA |
| **Notice Date:** | 01/11/2013 |
| **Details:** | ON OR ABOUT JANUARY 10, 2013, FINRA SENT A WELLS NOTICE (THE "NOTICE") TO REGISTRANT, THE CEO OF JOHN THOMAS FINANCIAL, INC. (THE "FIRM"). THE NOTICE STATES THAT FINRA'S STAFF HAS MADE A PRELIMINARY DETERMINATION TO INITIATE DISCIPLINARY PROCEEDINGS AGAINST REGISTRANT, ALLEGING, (1) THAT REGISTRANT WILLFULLY OR RECKLESSLY SOLD A SUBSTANTIAL PORTION OF A FIRM PROPRIETARY POSITION WHILE FAILING TO EXECUTE CUSTOMER ORDERS TO SELL SHARES OF THE SAME STOCK, AT PRICES THAT WOULD HAVE SATISFIED THE UNEXECUTED CUSTOMER ORDERS; (2) THAT REGISTRANT FAILED TO FOLLOW INSTRUCTIONS BY THE CUSTOMERS TO SELL THE SHARES (3) THAT HE USED MANIPULATIVE, DECEPTIVE AND/OR FRAUDULENT MEANS TO ARTIFICIALLY INFLATE THE PRICE OF THE STOCK; (4) THAT HE MADE MATERIAL MISREPRESENTATIONS, TO CUSTOMERS, REGISTERED REPRESENTATIVES AND FINRA, ABOUT THE REASONS WHY THE CUSTOMER ORDERS HAD NOT BEEN EXECUTED; (5) THAT IT FALSIFIED OR FAILED TO PRESERVE THE ORDERS IN QUESTION AND OTHER PERTINENT RECORDS; AND (6) THAT HE FAILED TO REASONABLY SUPERVISE THE RECEIPT, DOCUMENTATION AND EXECUTION OF THE CUSTOMER ORDERS. ACCORDING TO THE NOTICE, THIS CONDUCT ALLEGEDLY VIOLATED SEC RULES 10B-5, 17A-3 AND 17A-4 AND FINRA RULES 2020, 2010, 5320, 3110, 3010 AND 8210. |
| **Is Investigation pending?** | Yes |
| **Summary:** | REGISTRANT INTENDS TO CONTEST AND DEFEND THESE ALLEGATIONS VIGOROUSLY. |



## Employment Separation After Allegations

This type of disclosure event involves a situation where the broker voluntarily resigned, was discharged or was permitted to resign after allegations were made that accused the broker of (1) violating investment-related statutes, regulations, rules or industry standards of conduct; (2) fraud or the wrongful taking of property; or (3) failure to supervise in connection with investment-related statutes, regulations, rules or industry standards of conduct.

### Disclosure 1 of 1

| | |
|---|---|
| **Reporting Source:** | Firm |
| **Employer Name:** | S.W. BACH & COMPANY |
| **Termination Type:** | Discharged |
| **Termination Date:** | 12/13/2005 |
| **Allegations:** | POSSIBLE BLUE SKY VIOLATION AND INACCURATE REPRESENTATION OF IDENTITY TO CUSTOMER. ON 8/2/06 S.W. BACH HAS CONCLUDED AN INTERNAL REVIEW. BASED ON AVAILABLE INFORMATION, THE COMPANY CANNOT CONCLUDE THAT A BLUE SKY VIOLATION HAS OCCURRED. |
| **Product Type:** | Equity - OTC |
| **Other Product Types:** | |

| | |
|---|---|
| **Reporting Source:** | Broker |
| **Employer Name:** | SW BACH |
| **Termination Type:** | Discharged |
| **Termination Date:** | 12/13/2005 |
| **Allegations:** | BUE SKY VIOLATION, MISREPRESENTATION TO A CUSTOMER |
| **Product Type:** | No Product |
| **Other Product Types:** | |
| **Summary:** | ON AUGUST 2, 2006 S.W. BACH CONCLUDED AN INTERNAL REVIEW AND WERE NOT ABLE TO VALIDATE THAT A BLUE SKY VIOLATION HAD OCCURED. |

# End of Report



**This page is intentionally left blank.**